UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------------------x
TRAVIS HAYES,

                                        Petitioner,

-against-

ROBERT ERCOLE, Superintendent,
Green Haven Correctional Facility,

                                        Respondent.

------------------------------------------------------------------------x

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC# _____
DATE FILED:  6-15-12

**REPORT AND
RECOMMENDATION**

09 Civ. 5178 (PAC)(GAY)

TO:   THE HONORABLE PAUL A. CROTTY, U.S. DISTRICT JUDGE

## I.   INTRODUCTION

On September 23, 2003, Travis Hayes ("Hayes" or "petitioner") was convicted by a jury in County Court, Orange County (Rosenwasser, J.) of manslaughter in the first degree and criminal possession of a weapon in the second degree.  He was sentenced on November 7, 2003 as a violent felony offender to consecutive determinate terms of imprisonment of twenty-five years and seven years and a five-year and three-year period of post-release supervision, respectively.  Petitioner is incarcerated at Green Haven Correctional Facility in Stormville, New York.  Presently before this Court is petitioner's *pro se* Petition for a Writ of Habeas Corpus ("petition") pursuant to 28 U.S.C. § 2254.  For the reasons set forth below, I respectfully recommend that the Court deny the petition in its entirety.

Copies mailed / handed / faxed to counsel  6 / 15 / 12

## II. BACKGROUND

### 1. The People's Direct Case[1]

The charges in this case stem from the death of Usanda Thompson ("Usanda" or "victim") on December 21, 2002, in the City of Newburgh ("Newburgh"), New York. During the early morning hours of December 21, Usanda and his brother, Lakeem Thompson ("Thompson") were at Bricks Bar, located along Liberty Street and Gidney Avenue in Newburgh with friends Tony McLean ("McLean"), Treymaine Oats ("Oats"), Isaac Jackson ("Jackson"), and Ernest Redrick ("Redrick"), whose birthday they were celebrating. While at the bar, Thompson and McLean noticed Albert Blamoville ("Blamoville"), who was also known as "Al Berry," standing in a corner. He appeared to be staring at them. (Thompson, 291: 2-3.) At about 3:30 a.m., the group left the bar and headed to Usanda's white minivan. Oats drove, Redrick sat in the passenger seat and the rest sat in the back. (Thompson, 292: 14-18.) Shortly thereafter, while the van was stopped at a store on the corner of South and Chambers, Blamoville appeared and indicated that he wished to speak to Usanda by saying, "Usanda, let me holler at you." Usanda did not respond. (Thompson, 295: 5-10.) Blamoville then walked to a dark area at the side of the store and spoke with petitioner. It appeared to Jackson that Blamoville was having some sort of "conference or a meeting" with petitioner. (Jackson, 401: 12-24.) Blamoville returned to the van and again asked to speak with Usanda. This time, Usanda and Thompson exited the van. Usanda headed to the corner to speak with Blamoville while Thompson walked to the back of the van to relieve himself.

---

[1] Unless otherwise noted, the facts within this section are taken from Respondent's Memorandum of Law in Opposition to Petitioner's Application for a Writ of Habeas Corpus and Affirmation of Andrew Kass in Opposition to Petition for Habeas Corpus. All exhibits cited herein are to Respondent's Record of Exhibits.

Members of the group heard Usanda call out that Blamoville had a gun. (Thompson, 296: 7-10.)  Usanda, who was unarmed, grabbed Blamoville from behind and held him in a bear hug.  The two wrestled.  Thompson, who was standing about seventeen feet away at the time, testified that the area was well-lit by a street light. Blamoville, he said, appeared to be reaching for his gun, which was at his waist, but Usanda was preventing him from reaching it.  (Thompson, 296: 21-23, 297: 3-22.) Petitioner appeared, yelled for Usanda to get off of Blamoville and reached for his own hand gun, with which he struck Usanda on his head.  (Thompson, 298: 19-20, 299: 23-25; Oats, 378: 13-15, Jackson, 405: 15-24, Redrick, 467: 10-11, 469: 7-9, 470:7-9; McLean, 491: 10-11.)  Two of the witnesses testified that the petitioner cocked the hammer of the gun after he removed it from his waistband.  (Jackson, 405: 18-20; McLean, 487: 2-3.)  After he struck Usanda over the head, the gun fired.  Petitioner then pointed the gun toward Usanda's body and fired again.  (Thompson, 300: 8-17, 307: 11-12.)  Usanda and Blamoville fell to the ground.  Blamoville broke free, gained control of his gun and also shot at Usanda as Usanda was running toward the van.  (Thompson, 308: 11-16; Redrick, 470: 22-23.)   McLean saw petitioner run towards the van and start shooting.  (McLean, 489, 491.)  Witnesses heard a total of three to four shots. Petitioner fled from the scene.  Immediately thereafter, Usanda was transported in the van to Saint Luke's Hospital, where he died from the gunshot wound.

At the trial, Thompson testified that about two weeks before the incident, he was present during a conversation between Usanda and the petitioner that occurred on the corner of South and Chamber Streets in Newburgh.  (Thompson, 319: 18-25, 320.) Usanda told petitioner that petitioner had to pay for a windshield that he had shot.

During the same conversation, petitioner told Usanda to stay away from his girlfriend, Kadisha Sampson ("Sampson"), with whom petitioner had a child.  Usanda was also dating Sampson and he continued seeing her after this conversation.  (Thompson, 321.)

The Newburgh Police Department responded to the call for shots fired in the area of South and Chamber Streets at 4:15 a.m.  (Vasta, 503: 18.)  Officers secured the crime scene and recovered two .45 caliber shell casings.  (See Stipulation between Orange County D.A's Office and Hayes, 371: 16-25, 372: 1-8; Vasta, 504: 13-14.)  Police also responded to a call from St. Luke's Hospital regarding a large crowd and a commotion.  (Broe, 363: 20-24.)  There, they secured the minivan (see Stipulation, 369: 17-25, 370: 1-14) and interviewed witnesses.

The autopsy on the victim was conducted that same day by Dr. Luis Roh ("Roh"), Deputy Chief Medical Examiner for Westchester County and consultant to the Orange County Coroner's Office.  Roh observed that the victim had a single gunshot wound to the backside area of his waist and that the bullet had perforated his abdominal aorta and a lung, and fractured a rib before stopping in his neck area, from which Roh retrieved a large caliber bullet that was deformed.  (Roh, 454: 15-25, 455: 2-3.)  The trajectory was upward, back to front and left to right.  (Roh, 455: 4-5.)  During his external examination, Roh observed that the victim had a laceration on the left side of his head above the hair line, the result of blunt force trauma and a second laceration along his left forehead.  (Roh, 458: 3-10.)  Roh concluded that if the shooter was standing at the time he fired the bullet, the victim would have had to be bending forward or lying down on the ground.  (Roh, 460: 5-12.)  The recovered bullet was turned over to

Newburgh Police Detective David Hasbrouck (Roh, 461: 3-4), who submitted it to the New York State Police Mid-Hudson Regional Crime Laboratory for further analysis.

According to New York State Police Technical Sergeant Craig Grazier, a firearms examiner at the Forensic Investigations Center in Albany and a ballistics expert, the two .45 caliber casings from the scene were fired from the same weapon. The "jacketed .38 caliber projectile" bullet, recovered from the body, would not likely have been fired from the same weapon, according to Grazier, and more likely came from a revolver. (Grazier: 551: 17-25, 552: 2-10.) Police also retrieved a video recording made by a surveillance camera located on Chamber Street. On the video, an individual, identified at trial as the petitioner, was seen pointing a gun at the minivan. (See Thompson, 319: 7-17; Hayes, 745: 15.)

Petitioner was arrested on March 6, 2003 and charged with murder in the second degree (two counts), manslaughter in the first degree, manslaughter in the second degree, criminal possession of a weapon in the second degree, and criminal possession of a weapon in the third degree. (Ex. 1.)

## 2. The Defense's Case[2]

The defense called three witnesses. Terry Williams ("Williams"), who was at both Bricks Bar and the corner of South and Chamber Streets on December 21, 2002, testified that as he watched from his car three car lengths away, "a white van pulled up and Usanda jumped out of the van and grabbed Albert." (Williams, 602: 9-11.) Another witness, Angelo Robinson ("Robinson"), testified that Usanda got out of the van and tried to grab Blamoville and drag him back to the van. (Robinson, 614: 6-9.) A third

---

[2] Unless otherwise noted, the facts within this section are taken from Appellant Travis Haye's Brief, attached as Ex. 2 to Respondent's Record of Exhibits Volume I ("Appellant Br.") and Appellant Travis Haye's Supplemental Brief, attached to Respondent's Record of Exhibits as Ex. 5 ("Appellant Supp. Br.").

witness, Derick Atkins ("Atkins"), also testified that Usanda approached Blamoville first. (Atkins, 648:12-14.)  Atkins testified that he knew Blamoville had a gun, but that he also saw Usanda's gun "in his waistband" and "then a gun fell."  (Atkins, 649: 7-8.)  On cross-examination, Atkins was shown a statement he had signed two days after the incident in which he did not mention that Usanda had a gun.  (Atkins, 663-68.)  He was also shown a report, made by an investigator hired by the petitioner, which included his statement that he saw Blamoville approach Usanda first.  (Atkins, 675-78.)

The petitioner testified at trial.  He denied demanding that Usanda stop seeing Sampson, claiming that he was unaware of any relationship between the two.  The petitioner asserted that on December 21, 2002, he walked up Chamber Street to the same corner store at which Usanda and his friends had parked.  Along the way, he saw Robinson, Atkins, Blamoville and Jackson.  Petitioner went into the store and when he exited, he saw Usanda and Blamoville "tussling."  (Hayes, 715: 20-22.)  He knew that Blamoville carried a gun "a lot."  (Hayes, 736: 9-12.)  Petitioner approached so as to break up the fight and as he neared the two, a gun fell onto the ground.  Petitioner saw that Thompson was trying to get to the fallen gun and thinking that if he did not get to the gun first he would be shot, he grabbed it from the ground.  He told Usanda to get off Blamoville and then hit Usanda on his head.  The gun fired.  Petitioner initially thought he had shot Usanda in the head. (Hayes, 717.)  At that point, he says, he "tossed the gun.  That's when I heard the gun.  When I was running across the street, the van is backing up and hit me.  I pointed the gun at the van so it don't [sic] hit me.  I don't know if it discharged or fired."  (Hayes, 721: 3-7.)

After the incident, petitioner went to his aunt's house.  Blamoville arrived at the house and told petitioner that he, Blamoville, had shot Usanda.  (Hayes, 721-724.)

Petitioner testified that about ten days prior to the incident, on December 10, 2002, he had a conversation with Jamad Willis ("Willis").[3]  Willis told him that Usanda and his friends had attempted to kidnap him and that he was scared for his life.  (Hayes, 709.)

### B. People's Rebuttal

Detective John Zagarella testified that he took a sworn statement from Atkins on December 24, 2002.  (Zagarella, 761: 13-21.)  In that statement, Atkins did not mention that Usanda had a handgun or other weapon on the morning of December 21.

### C. Direct Appeal

In his direct appeal, petitioner made four claims:  1) the trial court erred in not permitting defendant to call a witness to testify about a prior incident involving the victim; 2) the evidence adduced at trial was legally insufficient; 3) the verdict was against the weight of the evidence; 4) defendant's sentence was excessive.  (See Appellant Br. at i.)  In a decision and order dated March 29, 2007, petitioner was granted leave to file a supplemental *pro se* brief.  (Ex. 4.)  In his supplemental brief, petitioner claimed that the trial court erred when it denied the defense request to give a temporary innocent possession charge to the jury and that he was denied effective assistance of counsel. (Appellant Supp. Br. at i.)  On May 6, 2008, the Appellate Division, Second Department, affirmed the judgment of the trial court.  See People v. Hayes, 51 A.D.3d 688, 858 N.Y.S.2d 242 (App. Div. 2008) (Ex. 7.)  On June 5, 2008, petitioner sought leave to

---

[3] Willis is variously referred to in the submissions and transcript as "Jamad" and "Jamal."

appeal to the New York State Court of Appeals, alerting the Court to four of his six claims, namely lack of temporary innocent possession jury charge, ineffective assistance of counsel, excessive sentence and legal sufficiency of the evidence.  On July 7, 2008, he filed a supplemental application, arguing three of the four points in his first letter (omitting the argument for insufficient evidence), and adding the claim for deprivation of the right to present a defense.  The Court of Appeals denied petitioner's application for leave to appeal on August 12, 2008.  See People v. Hayes, 894 N.E.2d 659 (N.Y. 2008).  Petitioner timely filed a Petition for Writ of Habeas Corpus on June 15, 2009, raising four claims:  1) the evidence was legally insufficient to support the jury's verdict; 2) the trial court erred in not permitting defendant to call a witness; 3) omission of requested jury instruction rendered the trial "fundamentally unfair;" 4) ineffective assistance of trial counsel.  On October 26, 2010, petitioner sought permission to place his petition in abeyance so as to present and exhaust a challenge to the legality of his sentence in state court.  The potential claim did not relate back to the claims set forth in the petition, rendering any amendment untimely.  As such, the motion to hold the petition in abeyance was denied on January 3, 2011.

## III. APPLICABLE LAW

### A. Standard of Review

"[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  Estelle v. McGuire, 502 U.S. 62, 67-68 (1991).  See 28 U.S.C. § 2254(a).  Subsequent to the enactment of the Antiterrorism and Effective Death Penalty

Act of 1996 ("AEDPA"), which amended 28 U.S.C. § 2254, a federal court may not grant habeas relief for any claim adjudicated on the merits in state court unless the petitioner establishes, in pertinent part, that the state court decision "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States[,]" 28 U.S.C. § 2254(d)(1), or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." Id. § 2254(d)(2).

A state court's decision is "contrary to" clearly established Federal law if (1) "the state court applies a rule that contradicts the governing law set forth in [Supreme Court of the United States] cases" or (2) "the state court confronts a set of facts that are materially indistinguishable from a decision of [the Supreme Court of the United States] and nevertheless arrives at a result different from [Supreme Court of the United States] precedent." Williams v. Taylor, 529 U.S. 362, 405 (2000).

Under § 2254(d)(1)'s "unreasonable application" prong, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A state court decision involves an "unreasonable application" of Federal Supreme Court precedent if (1) "the state court identifies the correct legal rule from [Federal Supreme Court] cases but unreasonably applies it to the facts of the particular state prisoner's case" or (2) "the state court either unreasonably extends a legal principle from [Federal Supreme Court] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

Finally, under AEDPA, the factual findings of state courts are presumed to be correct. 28 U.S.C. §2254(e)(1). The petitioner must rebut this presumption by "clear and convincing evidence." Id.

## B. Exhaustion Requirement

A federal court may not grant a writ of habeas corpus unless a petitioner has exhausted his remedies available in the state courts. 28 U.S.C. §2254(b)(1)(A). The exhaustion requirement promotes interests in comity and federalism by demanding that state courts have the first opportunity to decide a petitioner's claim. Rose v. Lundy, 455 U.S. 509, 518-19 (1982). A petitioner exhausts his state-court remedies by "fairly present[ing]" each federal claim for relief to the highest state court capable of review. Baldwin v. Reese, 541 U.S. 27, 29 (2004). If a claim is not fairly presented to the state courts, the habeas court will nonetheless deem it exhausted if "it is clear that the unexhausted claim is procedurally barred by state law and, as such, its presentation in the state forum would be futile." Aparicio v. Artuz, 269 F.3d 78, 90 (2d Cir. 2001). However, absent a showing of either "cause for the procedural default and prejudice attributable thereto," Harris v. Reed, 489 U.S. 255, 262 (1989), or "actual innocence," Schlup v. Delo, 513 U.S. 298 (1995), the petitioner's claim will remain unreviewable by a federal court.

## IV. ANALYSIS OF PETITIONER'S CLAIMS

### A. Legal Sufficiency of the Evidence

Petitioner initially contends that he is entitled to habeas relief because the evidence at trial was legally insufficient to support a conviction of second degree

manslaughter as an accessory pursuant to New York Penal Law §§ 125.20 (1), 20.00.[4]
The evidence reveals, he asserts, that as he left the corner store, he witnessed
Blamoville in a bear hug from behind by Usanda.  He did not pull a weapon from his
waist, but rather picked up the gun that had fallen to the ground and struck the victim in
the head so as to get him to release Blamoville.  The gun discharged, but the bullet did
not hit the victim.  The injury that resulted from the blow to the head from the gun was
not itself life threatening.  Moreover, he states, once Usanda let go of Blamoville, it was
Blamoville who shot Usanda in the back.  Petitioner states that there was no "request,
command or importune" from him to Blamoville to shoot the victim.  Petitioner's
conduct—before, during and after the victim had been shot by Blamoville—was
insufficient, he claims, to prove he "shared the intent of the principal actor."  (Pet.'s Br.
at 6.)

     The Second Department rejected this claim on the merits.  See People v. Hayes,
51 A.D.3d 688, 858 N.Y.S.2d 242 (App. Div. 2008) (Ex. 7) ("Viewing the evidence in the
light most favorable to the prosecution . . . , we find that it was legally sufficient to
establish the defendant's guilt beyond a reasonable doubt.  Moreover, resolution of
issues of credibility is primarily a matter to be determined by the jury, which saw and
heard the witnesses, and its determination should be accorded great deference on
appeal . . . .").

     An insufficient evidence claim is cognizable on habeas corpus review as a
violation of due process.  Jackson v. Virginia, 443 U.S. 307, 321 (1979).  A petitioner
who makes such a claim, however, "bears a very heavy burden."  See Fama v.
Commissioner of Correctional Servs., 235 F.3d 804, 811 (2d Cir. 2000).  He is entitled

---

[4] Petitioner does not question the legal sufficiency of the weapons conviction.

to relief only "if it is found that upon the record evidence adduced at the trial no rational

trier of fact could have found proof of guilt beyond a reasonable doubt." Jackson, 443

U.S. at 324.  Conversely, "[i]f '*any* rational trier of fact could have found the essential

elements of the crime,' the conviction must stand."  United States v. Badalamenti, 794

F.2d 821, 828 (2d Cir. 1986) (quoting Jackson, 443 U.S. at 319) (emphasis in original).

In reviewing the trial record, a federal habeas court views the evidence in the light most

favorable to the prosecution and draws all inferences in the prosecution's favor.  See

Wright v. West, 505 U.S. 277, 296-97 (1992); Jackson, 443 U.S. at 319.  The federal

court defers to the jury's assessments as to witness credibility and the weight of the

evidence.  See Maldonado v. Scully, 86 F.3d 32, 35 (2d Cir. 1996).  The sufficiency-of-

evidence "inquiry does not focus on whether the trier of fact made the *correct* guilt or

innocence determination, but rather whether it made a *rational* decision to convict or

acquit."  See Herrera v. Collins, 506 U.S. 390, 402 (1993) (emphases in original).

A federal habeas court reviewing an insufficient evidence claim must look to state

law to determine the elements of the crime.  See Quartararo v. Hanslmaier, 186 F.3d

91, 97 (2d Cir. 1999) (citation omitted).  Under New York law, a person is guilty of first-

degree manslaughter when "[w]ith intent to cause serious physical injury to another

person, he causes the death of such person or of a third person."  N.Y. Penal Law §

125.20(1).  A person need not directly cause the death of another to be criminally liable

for first-degree manslaughter.  Under New York law, a person may be criminally liable

for the conduct of another:

> When one person engages in conduct which constitutes an offense,
> another person is criminally liable for such conduct when, acting with the
> mental culpability required for the commission thereof, he solicits,

requests, commands, importunes, or intentionally aids such person to engage in such conduct.  N.Y. Penal Law § 20.00.

Upon a review of the record, it is clear that the evidence produced at trial was sufficient for the jury in this case to reasonably infer that the petitioner had the requisite intent to cause serious physical injury to the victim on an accessorial theory of liability with Blamoville.  Although Blamoville fired the shot that caused Usanda's death, a jury could have reasonably concluded that petitioner was an active and willing participant. First, Thompson, the victim's brother, testified to a motive on petitioner's part: that he had demanded that Usanda stop seeing his girlfriend and that Usanda had defied him by continuing to see the woman.  Blamoville was seen staring at the victim's group at the bar that evening and was later witnessed telling Usanda that he needed to speak to him outside of the van.  The petitioner was seen having a number of conversations with Blamoville in between Blamoville's attempts to get Usanda from the van and he entered the fray right after Usanda and Blamoville began wrestling.  Petitioner testified that he knew Blamoville frequently carried guns and he admitted that he hit Usanda over the head with a gun.  Five witnesses testified that petitioner took the gun from his waistband before hitting Usanda.  Furthermore, testimony established that by his actions, petitioner made it possible for Blamoville to break free from Usanda, who by all accounts was trying to avoid being shot by Blamoville's gun.  As a result, Blamoville gained access to his gun and fired the shot into Usanda's back.

Given this evidence, the petitioner's contention—that no rational trier of fact could have found the essential elements of accessorial liability beyond a reasonable doubt— was properly rejected by the Appellate Division.  There can be no conclusion, then, that the Appellate Division's determination was "contrary to, or involved an unreasonable

13

application of, clearly established Federal law" or was "based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." See 28 U.S.C. § 2254(d).

Accordingly, the petitioner's claim as to the sufficiency of the evidence should be denied.

### B. Petitioner's Right to Call a Witness

Petitioner claims that the trial court's exclusion of a potential defense witness's testimony violated his constitutional right to present a defense pursuant to the Compulsory Process Clause of the Sixth Amendment.[5]   Specifically, petitioner sought to call Jamad Willis, whom he states would have testified that Usanda attempted to kidnap him on December 9, 2002.  Willis relayed this information to petitioner prior to the December 21 incident.  (See Hayes, 692-704.)  The asserted purpose of Willis's testimony would have been to show petitioner's state of mind when he witnessed the altercation between Usanda and Blamoville.  (See Pet.'s Br. at 11.)  According to the petitioner, the testimony would have supported his theory that he reasonably believed Usanda was attempting to kidnap Blamoville and was thus justified in his actions.

The trial court, stating that "[n]o reasonable view of the evidence would support a claim of justification . . ." (tr. 702: 3-6), excluded Willis as a witness.  Nonetheless, the court allowed petitioner to testify that Willis told him that Usanda and some of his friends had attempted to kidnap him and that he, Willis, was scared for his life.  Petitioner also testified that the conversation with Willis "worried and scared" him.  (Hayes, 709: 8-25.)

---

[5] My conclusions are based upon my evaluation of petitioner's claims on their merits, without regard to the issue of exhaustion.  See 28 U.S.C. § 2254(b)(2).

On direct appeal, the Second Department found that this claim was "without merit or [did] not warrant reversal." See People v. Hayes, 51 A.D.3d 688, 858 N.Y.S.2d 242 (App. Div. 2008) (Ex. 7).

"The right to call witnesses in order to present a meaningful defense at a criminal trial is a fundamental constitutional right secured by both the Compulsory Process Clause of the Sixth Amendment and the Due Process Clause of the Fourteenth Amendment." Howard v. Walker, 406 F.3d 114, 131 (2d Cir.2005) (citation omitted). "Few rights are more fundamental than that of an accused to present witnesses in his own defense." Id. (quoting Taylor v. Illinois, 484 U.S. 400, 408 (1987)).  The Supreme Court has made clear, however, that the right to present evidence is subject to "reasonable restrictions" by the trial court.  See Petty v. Connolly, No. 07 Civ. 6090, 2011 WL 990161, at *16 (S.D.N.Y. Mar. 22, 2011) (citing United States v. Scheffer, 523 U.S. 303, 308 (1998)).  Thus, a trial court "may refuse to allow cumulative, repetitive, or irrelevant testimony." Id. (citing Geders v. United States, 425 U.S. 80, 87 (1976)).

In considering whether the exclusion of evidence violated a criminal defendant's right to present a complete defense, the reviewing court should start with "the propriety of the trial court's evidentiary ruling." Wade v. Mantello, 333 F.3d 51, 59 (2d Cir. 2003). If potentially exculpatory evidence was erroneously excluded, the reviewing court looks to "whether 'the omitted evidence [evaluated in the context of the entire record] creates a reasonable doubt that did not otherwise exist.'" Justice v. Hoke, 90 F.3d 43, 47 (2d Cir.1996) (quoting United States v. Agurs, 427 U.S. 97, 112 (1976)) (alteration in original).  If, on the other hand, the state court's evidentiary ruling was correct as a matter of state evidentiary law, the habeas court's "inquiry is more limited [,]" addressing

itself only to "whether the evidentiary rule is arbitrary or disproportionate to the purposes [it is] designed to serve." Hawkins v. Costello, 460 F.3d 238, 244 (2d Cir. 2006) (internal quotation marks and citation omitted). A state evidentiary rule is "unconstitutionally arbitrary or disproportionate only where it has infringed upon a weighty interest of the accused." Id. (citing Scheffer, 523 U.S. at 308).

Under New York law, a defendant in a prosecution for homicide who is asserting justification as a defense may introduce evidence of specific acts of violence committed by the victim so long as they "relate reasonably, in time and quality, to the defense raised by the defendant." People v. Miller, 349 N.E.2d 841, 847 (N.Y. 1976). The extent to which evidence of prior violent acts may be proved rests in the discretion of the trial court. Id.

Here, the trial court's decision to omit Willis's testimony was not erroneous as a matter of law. First, defense counsel indicated that during the alleged kidnapping attempt, Usanda was not armed and Willis was not harmed. In addition, petitioner was permitted to testify about the alleged conversation he had with Willis and a defense witness also alluded to a possible kidnapping when he stated that Usanda attempted to drag Blamoville to the van. (See Robinson, 614: 6-9.) Evidence supporting petitioner's theory, therefore, was not excluded from the trial. See Roberts v. Scully, 875 F.Supp. 182, 190 (S.D.N.Y. 1995) (excluded evidence was not material where petitioner was able to "communicate to the jury the essentials of what he claimed" the excluded evidence would have shown).

Since the trial court's decision was not made in error, this Court must consider whether the evidentiary rule the court applied is arbitrary or disproportionate to the

purposes it is designed to serve.  <u>See</u> <u>Scheffer</u>, 523 U.S. at 308.  Here, given the

marginal probative value of the testimony, there is no basis upon which to find that its

omission infringed on any of the petitioner's weighty interests.  <u>See</u> <u>Hawkins</u>, 460 F.3d

at 244 ("The [Supreme] Court has 'never questioned the power of States to exclude

evidence through the application of evidentiary rules that themselves serve the interests

of fairness and reliability—even if the defendant would prefer to see that evidence

admitted'") (quoting <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986)).  Petitioner was thus

not deprived of his right to present a defense.

     Even if this Court were to agree that the trial court erroneously excluded this

witness's testimony, any error was harmless.  As stated above, in order to demonstrate

that a defendant's right to present a defense was violated, the evidence erroneously

excluded must be evaluated in the context of the entire record to determine if it would

have created a reasonable doubt that did not otherwise exist.  <u>Justice</u>, 90 F.3d at 47.

That is undoubtedly not the case here.

     Accordingly, I conclude that petitioner's second claim for habeas relief is without

merit and must be denied.

### C. Temporary Lawful Possession Jury Charge

     Petitioner next argues that the trial court violated his due process rights by failing

to give a temporary lawful possession charge to the jury in relation to the crime of

Criminal Possession of a Weapon in the Second Degree.  Since there was conflicting

testimony about whether he had the gun in his waistband before he hit Usanda,

petitioner states, the jury should have received the charge, which was requested by his

attorney.  By not granting the request, petitioner contends, the prosecution was relieved

of its burden of proof with respect to petitioner's "reasonable belief" that he was preventing another citizen from imminent injury. (See Pet.'s Br. at 19.) The Appellate Division rejected petitioner's argument on the merits. See People v. Hayes, 51 A.D.3d 688, 858 N.Y.S.2d 242 (App. Div. 2008) (Ex. 7).

To establish that an erroneous jury charge deprived him of a right to a fair trial, a petitioner must satisfy two requirements. First, he must show that he "was erroneously deprived of a jury instruction to which he was entitled under state law." Jackson v. Edwards, 404 F.3d 612, 621 (2d Cir.2005) (citation omitted). Second, he must demonstrate that the omitted instruction "so infected the entire trial that the resulting conviction violates due process." Estelle, 502 U.S. at 72. "An omission . . . is less likely to be prejudicial than a misstatement of the law." Henderson v. Kibbe, 431 U.S. 145, 97 (1977).

While it is settled that the mere possession of a weapon is not criminal in every instance, New York courts have said that "to trigger the right [to a charge of temporary and lawful possession] there must be proof in the record showing a legal excuse for having the weapon in [defendant's] possession as well as facts tending to establish that, once possession has been obtained, the weapon had not been used in a dangerous manner." People v. Williams, 409 N.E.2d 1372, 1373 (N.Y. 1980). The underlying purpose of the temporary innocent possession charge is to foster "a civic duty on the part of citizens to surrender dangerous weapons to the police." Id.

Even based solely on petitioner's version of events—that he hit the victim over the head with a weapon; that he believed he had killed the victim; that thereafter, he pointed the weapon at a vehicle and was not sure if it had discharged; and that he

disposed of the gun in a public street—there was no reasonable view that would have supported the requested jury charge and thus, the trial court reached the correct conclusion.  (See Tr. 775-776.)  Moreover, a review of the charge given by the trial court reveals that the prosecution was not relieved of its burden of proof, as claimed by petitioner.  First, the jury was given a permissive presumption in regard to possession of a loaded weapon.[6]  (See Tr. 878: 3-12.)  Given the evidence in the record, the jury rationally could have drawn the inference that petitioner had the requisite intent to use the firearm unlawfully.  See County Court of Ulster County, N. Y. v. Allen, 442 U.S. 140, 57 (1979) ("Because this permissive presumption leaves the trier of fact free to credit or reject the inference and does not shift the burden of proof, it affects the application of the 'beyond a reasonable doubt' standard only if, under the facts of the case, there is no rational way the trier could make the connection permitted by the inference.  For only in that situation is there any risk that an explanation of the permissible inference to a jury, or its use by a jury, has caused the presumptively rational factfinder to make an erroneous factual determination.").  Thereafter, the trial court judge delineated the four elements of Criminal Possession of a Weapon in the Second Degree and instructed the jury that each of the elements must be proven beyond a reasonable doubt or the defendant must be found not guilty.  (See Tr. 879.)

Considering the record and the jury charge as a whole, the trial court's refusal to give the specific instruction requested by the petitioner was not erroneous nor does petitioner establish any due process violation.  Consequently, the Appellate Division's

---

[6] The Court said, "[U]nder our law the possession by any person of a loaded firearm is presumptive evidence of intent to use the same unlawfully against another.  What that means is: If the People have proven beyond a reasonable doubt that the defendant possessed a loaded firearm, then you may, but are not required to, infer from that fact that he did so with the intent to use the same unlawfully against another."  (Tr. 878:3-12.)

determination was not contrary to or an unreasonable application of clearly established federal law and this claim, too, must be denied.

### D. Ineffective Assistance of Counsel

Finally, petitioner claims he was denied his constitutional right to the effective assistance of counsel because his trial counsel withdrew his request for a justification charge.  Petitioner argues that the evidence was sufficient to support a finding that he had a "reasonable belief" that Usanda was attempting to kidnap Blamoville and counsel's decision to withdraw the request thereby "substantially infringed" upon his right to due process.  (Pet.'s Br. at 23-24.)  The Appellate Division denied this claim on the merits.  See People v. Hayes, 51 A.D.3d 688, 858 N.Y.S.2d 242 (App. Div. 2008) (Ex. 7).

Petitioner's claim of ineffective assistance of trial counsel is analyzed under the rubric established in Strickland v. Washington, 466 U.S. 668 (1984).  See Hemstreet v. Greiner, 491 F.3d 84, 89 (2d Cir. 2007).  Strickland created a two-part test that assesses: (1) whether counsel's performance was deficient; and (2) if prejudice resulted from the attorney's deficient performance.  See Strickland, 466 U.S. at 687; Harrington v. Richter, 131 S. Ct. 770, 787 (2011); Gueits v. Kirkpatrick, 612 F.3d 118, 122 (2d Cir. 2010).

In order to satisfy the deficiency prong, petitioner must prove that, "counsel's representation fell below an objective standard of reasonableness."  Strickland, 466 U.S. at 688.  The crux of the inquiry is whether the "attorney's representation amounted to incompetence under 'prevailing professional norms,' not whether it deviated from best practices or most common custom."  Harrington, 131 S. Ct. at 788.  In conducting its

analysis, the Court "must make every effort . . . to eliminate the distorting effects of hindsight, and indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound [ ] strategy." Bell v. Miller, 500 F.3d 149, 156 (2d Cir. 2007) (quoting Strickland, 466 U.S. at 689).

Strickland's prejudice prong requires the petitioner to demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Strickland, 466 U.S. at 694.  A reasonable probability is defined as a "probability sufficient to undermine confidence in the outcome."  Id.

When the "highly deferential" standards created by Strickland and § 2254 act in tandem, habeas review is "doubly" deferential.  Harrington, 131 S. Ct. at 788. The Supreme Court has explained that in the context of habeas review, "the question is not whether a federal court believes the state court's determination under the Strickland standard was incorrect but whether that determination was unreasonable, a substantially higher threshold."  Knowles v. Mirzayance, 129 S. Ct. 1411, 1420 (2009)(quotation marks omitted).  Thus, a state court's adjudication of an ineffective assistance of trial or appellate counsel claim is entitled to "substantial deference." Rosario v. Ercole, 601 F.3d 118, 123 (2d Cir. 2010).

"When evidence at trial viewed in the light most favorable to the accused, sufficiently supports a claimed [justification] defense, the court should instruct the jury as to the defense, and must when so requested. . . .  As a corollary, when no reasonable view of the evidence would support a finding of the tendered defense, the

court is under no obligation to submit the question to the jury." People v. Watts, 442 N.E.2d 1188, 1189 (N.Y. 1982) (internal citations omitted).  Moreover, "if there is a reasonable probability that the jury would not have determined that the defendant's actions were justified—assuming the appropriate charge had been given—then the defendant's subsequent habeas petition based on ineffective assistance of counsel for failing to request that charge must necessarily fail." Rodriguez v. Ercole, No. 07 Civ. 415, 2010 WL 2303199, at *6 (S.D.N.Y. June 7, 2010).

Under New York law, the defense of justification "affirmatively permits the use of force under certain specified circumstances." Id. at *3.  A person may "use physical force upon another person when and to the extent he or she reasonably believes such to be necessary to defend himself, herself or a third person from what he or she reasonably believes to be the use or imminent use of unlawful physical force by such other person [.]"  N.Y. Penal Law § 35.15(1).  A person may not use deadly physical force[7] upon another person unless the actor "reasonably believes that such other person is using or about to use deadly physical force[,]" id. § 35.15 (2)(a), or "reasonably believes that such other person is committing or attempting to commit a kidnapping, . . . ." Id. § 35.15 (2)(b).

The evidence here does not support a charge of justification.  First, petitioner testified that he knew Blamoville frequently carried a gun, especially at night.  Further, he admitted that he did not see Usanda with a gun during the altercation.  In fact, he stated that he saw Usanda's hands a number of times and they were empty.  There was

---

[7]"Deadly physical force" is defined as "physical force which, under the circumstances in which it is used, is readily capable of causing death or other serious physical injury." N.Y. Penal Law § 10.00(11). "'Deadly physical force' is an appropriately expansive term, geared to the particular circumstances of an encounter. The physical force need not be premised on the use of a deadly instrument; nor, if such an instrument is employed, need there be, for example, in the case of a firearm, its deliberate discharge, . . ." Donnino, Practice Commentary, McKinney's Cons. Laws of N.Y., Book 39, Penal Law § 35.00, at 239.

no reason, therefore, for petitioner to have believed that Usanda was about to use unlawful or deadly physical force upon Blamoville.  Second, the link between the conversation petitioner previously had with Jamad Willis—in which Willis stated that Usanda had attempted to kidnap him—does not support petitioner's contention that he "reasonably believed" Blamoville was about to be kidnapped and/or that Usanda was armed.  As stated supra Part B, defense counsel readily indicated that during the alleged kidnapping attempt, Usanda was not armed and Willis was not harmed.

The Supreme Court has held that trial counsel's decision not to pursue a justification defense is a tactical choice that is "virtually unchallengeable." Strickland, 466 U.S. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  In the case at bar, even if petitioner's trial counsel had pursued the charge, petitioner does not demonstrate a reasonable probability that he would have prevailed.  In fact, it is highly unlikely.  The trial court had denied petitioner's request to call Willis as a witness largely because the judge had determined that the evidence did not support a justification defense.  (See Tr. 702: 3-6.)

The state court's conclusion, therefore, that petitioner was not denied effective assistance of counsel was not contrary to or an unreasonable application of clearly established federal law.  See Rivera v. Ercole, 2007 WL 2706274, at *24-26 (rejecting claim that trial counsel was ineffective for not pursuing a justification defense where there was no evidence that the victim was armed or about to use deadly force against petitioner); Perez v. Greiner, No. 01 Civ. 7140, 2003 WL 21203351, at *5 (S.D.N.Y. May 21, 2003) (rejecting claim that trial counsel was ineffective for not pursuing a justification defense where there was no evidence in the record that the victim was using or about to

23

use deadly force).  Moreover, given the evidence in the case, petitioner has not demonstrated that he was prejudiced by the decision not to pursue the charge.

Accordingly, petitioner's claim must be denied.

## V.  CONCLUSION

For the foregoing reasons, I respectfully recommend that the instant petition for a writ of habeas corpus be denied in its entirety.

## VI.  NOTICE

Pursuant to 28 U.S.C. § 636(b)(1)(c) and Rule 8(b)(3) of the Rules governing § 2254 proceedings, the parties shall have fourteen (14) days from the receipt of this Report to serve and file written objections to this Report and Recommendation.  If copies of this Report are served upon the parties by mail, the parties shall have seventeen (17) days from receipt of this Report to file and serve written objections.  See Rule 11 of the Rules governing § 2254 proceedings; Fed.R.Civ.P. 6(d).  Such objections, if any, shall be filed with the Clerk of the Court, with extra copies delivered to the chambers of The Honorable Paul A. Crotty at the United States District Court, Southern District of New York, 500 Pearl Street, New York, New York, 10007, and to the chambers of the undersigned at 300 Quarropas Street, White Plains, New York 10801.

Failure to file timely objections to this Report and Recommendation will preclude later appellate review of any order of judgment that will be entered.  See Caidor v. Onondaga County, 517 F.3d 601, 604 (2d Cir. 2008).

Requests for extensions of time to file objections must be made to The Honorable Paul A. Crotty and not to the undersigned.

15

Dated: June _____, 2012
White Plains, New York

Respectfully Submitted,

_____
GEORGE A. YANTHIS, U.S.M.J.